UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDRA HERNDEN,

                                                    Civil Case No. 22-cv-12313

      Plaintiff,

v.                                           HON. MARK A. GOLDSMITH

CHIPPEWA VALLEY SCHOOLS et al.,

      Defendants.

_____/

**OPINION & ORDER**
**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 24) AND**
**(2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 25)**

      This is a First Amendment retaliation action under 42 U.S.C. § 1983 brought by Plaintiff

Sarah Hernden against the Chippewa Valley School District (the District); two members of the

District's Board of Education (the Board); and Elizabeth Pyden and Frank Bednard (collectively,

Defendants). Hernden alleges that Defendants unlawfully retaliated against her for expressing her

opposition to school policies by reporting concerns about Hernden's conduct to her then-supervisor

at the Harper Woods police department and submitting a complaint to the U.S. Department of

Justice (DOJ). Defendants argue that Hernden has not established that she suffered any adverse

action because Defendants' conduct could not, as a matter of law, have a chilling effect on First

Amendment activities. Both parties now move for summary judgment. For the reasons that follow,

the Court grants Defendants' motion for summary judgment (Dkt. 25) and denies Plaintiff's motion

for summary judgment (Dkt. 24).[1]

_____

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided
based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to

## I.    BACKGROUND

Hernden is a police officer and the mother of a child who formerly attended school in the Chippewa Valley School District.  Pl. Dep. at 4, 6 (Dkt. 24-2).  During the COVID-19 pandemic, the District implemented policies limiting in-person instruction. Compl. ¶ 16 (Dkt. 1).  Hernden, as a member of the organization Moms for Liberty, Pl. Dep. at 30–31, opposed these policies while attending in-person and virtual Board meetings and individually contacting Board members. Compl. ¶ 16–18.  These interactions were deemed "heated" by some participants, with Hernden on at least one occasion likening the District's mask policy to Nazi Germany.   Compl. ¶ 18; Bednard Aff. ¶ 10 (Dkt. 25-4).

On December 10, 2020, Hernden emailed the Board an editorial published in the Chicago Tribune regarding remote learning.  See Compl. at Ex. A (Dkt. 1-2).  Defendant Elizabeth Pyden, a member of the Board, responded to Hernden's email by reiterating that the District's policies were implemented as safety precautions.  Id. In response, Hernden argued that the policies were misguided and based on political, not medical, considerations, and that the Board was undermining public trust.  Id.

The following day, Pyden forwarded this exchange between herself and Hernden to Hernden's then-supervisor at the police department, police chief Vance Smith.  Id.  In her e-mail to Smith, Pyden noted that she was "concern[ed] regarding how one of your officers [Hernden] conducts herself in her own community" and by the "level of anger, disrespect, and veiled racism" in Hernden's conduct.   Id.  Pyden continued, "[w]hile I do not expect you to take any adverse action, I do believe it is important for you to know how one of your officers is conducting herself

the motions, the briefing includes Plaintiff's response (Dkt. 29) and Defendants' response (Dkt. 28) and reply (Dkt. 30).

within the community and perhaps offer some guidance." Id.  Pyden noted that she sent the email unilaterally, without knowledge of the Board, and out of her own concern about Hernden's conduct.  Pyden Aff. ¶¶ 14–21 (Dkt. 25-3).

In response to Pyden's email, Smith and deputy chief Ted Stager investigated Hernden's conduct and concluded that she was not in violation of any departmental rules.  Compl. ¶¶ 20–21. Hernden was neither reprimanded, nor disciplined.  Compl. ¶ 21.  She acknowledges that she continued to attend Board meetings and engage in dialogue with the Board and its members. Compl. ¶ 22.

On October 4, 2021, Hernden once again emailed the Board, this time about a case decided by the Sixth Circuit related to First Amendment rights of parents at school board meetings.  See Compl. at Ex. B (Dkt. 1-3).  In addition to a link discussing the case, Hernden wrote: "Once again, law on parents (sic) side.  Maybe a lil (sic) more due care and caution at the next meeting . . . . You know, when you let your (sic) hatred you have for me take hold and you interrupt me. 1st 2 were free . . . ." Id.

On the same day, the DOJ issued a memorandum informing school districts that the DOJ was "committed to using its authority and resources to discourage" "threats of violence or efforts to intimidate" school officials.  Compl. at Ex. C (Dkt. 1-4).  Bednard, the president of the Board, submitted a complaint to the DOJ, attaching Hernden's October 4th email and noting:

> I appreciate your looking into these groups of people who bring such threats to anybody that stands in their way. The email I included below is from Sandra Hernden. This woman, Sandra Hernden, comes to our every meeting to harass our board, administration, and community who oppose her views. . . . [Hernden] goes around to school board meetings throughout the tri county area to promote her agenda in any way she can including threats and intimidation. She is part of a group called, "Mothers for Liberty" that attend our meetings. This group of people attend every meeting, and because their threats and demeanor are so intimidating, no community members who oppose their message will come to the meeting to speak because they are afraid of what this group would do to them for standing up to them.

Our school district has over 15,000 students. We know that they have not gained any traction as it is the same 10-15 people that show up at every meeting to intimidate, threaten, and harass. Anything that could be done to curb this behavior by these people would be greatly appreciated by our board, administration, and our community.

See Compl. at Ex. B.

Bednard shared his submitted complaint with the Board.  Id.  Hernden, however, was unaware that Bednard had submitted this complaint—she was only later made aware when a friend identified the complaint through a FOIA request.  Pl. Dep. at 28.  It remains unclear whether the DOJ investigated the matter, but Hernden was never contacted by law enforcement, nor was any action taken against her.  Id. at 29.

Hernden filed this action, asserting claims under the First Amendment pursuant to 42 U.S.C. § 1983 against Pyden, Bednard, and the District.  She alleged that Pyden's email to Smith and Bednard's email to the DOJ were unlawful retaliatory acts in response to her exercise of free speech.  The Court previously rejected the District's motion to dismiss, 6/22/23 Op. & Order (Dkt. 23), but narrowed potential municipal liability against the District to the actions of Bednard, but not Pyden.  See id. at 8, 14.  Before the Court are summary judgment motions filed by both Hernden and  Defendants.

## II.      ANALYSIS[2]

To survive summary judgment on a First Amendment retaliation claim under § 1983, a plaintiff must show that: (i) plaintiff was engaged in constitutionally-protected speech; (ii)

---

[2] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming

defendants took some adverse action that would "deter a person of ordinary firmness" from continuing to engage in protected speech; and (iii) defendants' adverse actions were "motivated" by the plaintiff's protected speech.  Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (per curiam); Fritz v. Charter Twp. of Comstock, No. 1:07-cv-1254, 2010 WL 2802453, at *3 (W.D. Mich. July 15, 2010), aff'd, 463 F. App'x 493 (6th Cir. 2012) ("In order to survive summary judgment on her § 1983 First Amendment retaliation claim, Plaintiff must present sufficient evidence to create a triable issue of fact as to each of the [three] elements.").

Although there is some dispute among the parties as to whether Hernden's conduct is protected under the First Amendment and whether Defendants' actions were motivated by Hernden's protected speech, see Pl. Mot. for Summ. J. at 6–9, 12–14, 16–17, 18–19; Defs. Mot. for Summ. J. 23–24, the Court need not reach the merits of these issues.  The primary disagreement—which is dispositive here—is whether, as a matter of law, there was an adverse action against Hernden that have would "deter[red] a person of ordinary firmness" from engaging in protected speech.  See Pl. Mot. for Summ. J. at 9–12, 17–18; Defs. Mot. for Summ. J. at 13–20.

While an adverse action need not be "egregious" to survive summary judgment, "de minimis" threats or "inconsequential actions" are not sufficient, Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d 807, 822 (6th Cir. 2007) (punctuation modified), because "allowing constitutional redress for every minor harassment may serve to trivialize the First Amendment," Mattox v. City of Forest Park, 183 F.3d 515, 521 (6th Cir. 1999).  This is an "objective inquiry," Stolle v. Kent State Univ., 610 F. App'x 476, 483 (6th Cir. 2015), but the "analysis . . . must be

---

forward with evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1985).

tailored to the circumstances" of each case, <u>Fritz v. Charter Twp. of Comstock</u>, 592 F.3d 718, 724 (6th Cir. 2010).

The Sixth Circuit has established that a person of "ordinary firmness" may be deterred from engaging in protected First Amendment activities—and has suffered adverse action—if there is a "credible threat" to their "economic livelihood," <u>Fritz</u>, 592 F.3d at 728, or if they have to "endur[e] a criminal investigation" by the state and are subject to "direct injury or immediate threat of harm" because of the investigation, <u>Haggart v. City of Detroit</u>, No. 2:19-cv-13394, 2021 WL 5040293, at *4 (E.D. Mich. Oct. 27, 2021); <u>Gordon v. Warren Consol. Bd. of Educ.</u>, 706 F.2d 778, 780–781 (6th Cir. 1983).

The parties debate the merits of (i) whether Pyden's e-mail to Hernden's supervisor posed a "credible threat" to her employment; and (ii) whether Bednard's complaint to the DOJ and the possibility of a criminal investigation qualifies as an adverse action.  The Court addresses each issue in turn.

**A.  Pyden's E-mail to Hernden's Supervisor**

With regards to the communication between Pyden and Hernden's supervisor at the police department, the parties dispute whether Pyden's e-mail was "mere criticism [that] is not actionable," Defs. Mot. for Summ. J. at 15, or whether it "threat[end]" Hernden's "economic livelihood" in a way that would deter a person of "ordinary firmness" in Hernden's situation from exercising their First Amendment rights, Pl. Mot. for Summ. J. at 11.  Hernden argues that "the Sixth Circuit has already recognized" that simply "complain[ing] to a citizen's employer [is] sufficient" to qualify as an adverse action.  Pl. Mot. for Summ. J. at 10.  The cases Hernden relies on, however, suggest otherwise. <u>See</u> Pl. Mot. for Summ. J. at 10 (citing <u>Frtiz</u>, 592 F.3d 718 and <u>Paige v. Coyner</u>, 614 F.3d 273 (6th Cir. 2010)).

"The term 'adverse action' arose in the employment context and has traditionally referred to actions such as discharge, demotions, refusal to fire, nonrenewal of contracts, and failure to promote."  Fritz, 592 F.3d at 724 (punctuation modified).  Thus, courts have only deemed a defendant's complaint to a plaintiff's employer to be an adverse action in particular circumstances.  One is if the defendant exerted "pressure" on the employer to take disciplinary action.  See id. at 725.  Another is where the defendant could "reasonably [have] foreseen" that the complaint would lead to discipline because the defendant exercised some "authority" or influence over the employer.  Paige, 614 F.3d at 282 (holding that there was adverse action because it was "reasonably foreseeable" that the employer would take a complaint by a city official seriously to avoid "jeopardiz[ing] [a] working relationship with . . . County officials").

Here, Pyden's email to Hernden's supervisor at the police department did not rise to the level of threatening Hernden's economic livelihood.  Pyden expressly noted in her email that she "d[id] not expect [the Department] to take any adverse action" against Hernden.  See Compl. at Ex. A.  Even if Pyden sought to insinuate otherwise, she could not reasonably have foreseen that the Department would take any action in response to her letter, given that she was writing in her capacity as a private citizen with no authority or influence over the actions of the Department.  See Anders v. Cuevas, 984 F.3d 1166, 1177 (6th Cir. 2021) (holding that a town official's "badgering" of an employer, over whom the official did not "exercise[] any influence" and who could not affect the company's "opportunity to receive business," did not reach the level of an adverse action); Blick v. Ann Arbor Pub. Sch. Dist., 674 F. Supp. 3d 400, 432 (E.D. Mich. 2023) (holding that the mere filing of a police report or complaint "is not an adverse action . . . and Plaintiff has not provided any legal support to the contrary").

At most, the only concrete consequence of Pyden's e-mail that Hernden can point to is that the police department did carry out an investigation into whether Hernden's speech was in violation of Department policies "at a time when other parents had been terminated for their activism against COVID-19 school policies."  Pl. Mot. for Summ. J. at 13.[3]  However, an employer's internal investigation of an employee's conduct, without more, is insufficient to support a claim of adverse action.  See Stolle, 610 F. App'x at 483–484 (finding no adverse action when a government official's complaint about a professor's letter prompted an internal investigation by the university, even when the professor was found to be "in violation of [university] policy" and "reprimand[ed]" for his conduct); Sensabaugh v. Halliburton, 937 F.3d 621, 628–629 (6th Cir. 2019) (holding that there was no adverse action when a football coach received a "Letter of Guidance" following an investigation into his social media posts by the school because the letter "did not itself impose any discipline or alter [Plaintiff's] employment conditions in any way").

Unlike the plaintiffs in Stolle and Sensabaugh, who at least were found to be in violation of school policy and were subject to "reprimand" from their supervisors, Hernden was fully exonerated of any wrongdoing and subject to no tangible employment action, not even a "reprimand."  In fact, the confirmation from her supervisor that her speech did not conflict with any police department policies removed any shadow of doubt as to whether her employment was at risk.  The fact that Hernden continued to be outspoken at Board meetings only further confirms that she never considered her speech to pose a threat to her employment.  See Whiting v. City of Athens, 699 F. Supp. 3d 652, 660–661 (E.D. Tenn. 2023) (holding that although the inquiry is an objective one, "the fact that a plaintiff was not in fact deterred by the adverse action can support

---

[3] It is unclear from the briefing what Hernden means by "terminated."

the conclusion that a person of ordinary firmness would not be deterred or chilled by the conduct"); see also Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 585 (6th Cir. 2012) ("Our conclusion [that a person of ordinary firmness would not be deterred by the adverse conduct] is supported by the fact that [the plaintiff] was not deterred or chilled in the exercise of his First Amendment rights as the result of defendants' wrongful conduct.").

In light of these foregoing reasons, Hernden can hardly claim that Pyden's e-mail threatened her "economic livelihood" or that a reasonable person in her situation would have restrained the exercise of their free speech right—especially when she herself did not feel compelled to do so. Pyden's e-mail was nothing more than a "minor harassment" towards Hernden's free speech rights and such de minimis allegations do not rise to the level of a First Amendment retaliation claim. Mattox, 183 F.3d at 521.

## B. Bednard's Complaint to the DOJ

With regards to Bednard's complaint submitted to the DOJ, Hernden argues that "[t]his Court has repeatedly held that criminal investigations will deter a person of ordinary firmness from continuing to engage in protected First Amendment [a]ctivity." Pl. Mot. for Summ. J. at 17. However, as Defendants rightly point out, Hernden "only cites to case law where an investigation was actually conducted." Defs.' Resp. to Pl. Mot. for Summ. J. at 3 (citing Raboczkay v. City of Taylor, No. 19-12144, 2020 WL 1873327, at *4 (E.D. Mich. Apr. 15, 2020), which found an adverse action supporting a retaliation claim when defendants' "defamatory letters" instigated a criminal investigation lasting nearly four months and where the plaintiff was "suspended pending the outcome" of the investigation).

The prerequisite that an investigation take place was clarified in Laird v. Tatum, 408 U.S. 1 (1972). There, the Supreme Court instructed that a plaintiff can only allege a "deterrent[] or

'chilling'" effect on speech from a criminal or government-sanctioned investigation if they can identify "specific present objective harm or a threat of a specific future harm" stemming from an "exercise of governmental power that [is] regulatory, proscriptive, or compulsory in nature, and [where] the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." Id. at 11, 14.  A plaintiff who is forced to "endur[e] a[n] [actual] criminal investigation" and is subject to an "immediate threat of harm" has suffered an adverse action, see Haggart, 2021 WL 5040293, at *4.

But a plaintiff claiming injury from the possibility of being subject to a hypothetical or potential investigation has not suffered an adverse action, especially if no such investigation materializes or the investigation is "inconsequential" for the plaintiff.  See Wurzelbacher, 675 F.3d at 582–585 (finding no adverse action when a plaintiff was subject to an inappropriate, but "inconsequential," investigation by a state agency because he suffered "no threat to [his] economic livelihood," no "search or seizure of property" and no "public disclosure of intimate or embarrassing information"); Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 374–376 (6th Cir. 2011) (holding that "the mere presence of an intelligence data-gathering activity" that the "[p]laintiffs, or others," were likely not aware of and that did not plausibly affect their conduct could not "give rise to constitutional liability") (punctuation modified).

Hernden argues that she suffered adverse action because Bernden's letter could have exposed her to an investigation by the DOJ and the threat of such an investigation alone would compel a person of "ordinary firmness" from participating in constitutionally-protected speech. Pl. Mot. for Summ. J. at 17.  Yet Hernden does not and cannot explain how Bednard's complaint would plausibly have compelled her to alter her conduct when she was not even aware that a complaint had been filed in the first place.  See Wells v. Rice, 692 F. Supp. 3d 735, 746 (E.D. Ky.

2023) ("An injury of which [a party is] not even aware cannot deter them and thus cannot support a retaliation claim.").  Even when made aware of the complaint through a friend, there was no indication that any investigation would materialize because, as with Pyden's relationship vis-à-vis the police department, Bednard had no influence over the DOJ's discretionary choices.  See Defs.' Resp. to Pl. Mot. for Summ. J. at 3-4.

And, as far as the record suggests, no investigation did materialize.  Defs. Mot. for Summ. J. at 8 ("Plaintiff admitted that the DOJ has not taken any action or contacted her in any manner."). In fact, Hernden has only expressed a "subjective fear" of a hypothetical federal investigation, but this is insufficient to meet the burden in <u>Laird</u> of a "specific" and "objective harm" from government action.  <u>Gordon</u>, 706 F.2d at 781.

**C.  <u>Monell</u>**

Because the Court finds no constitutional violation, the District is also entitled to summary judgment on Hernden's <u>Monell</u> claim.  See <u>Blackmore v. Kalamazoo Cnty.</u>, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation . . . .").

### III.   CONCLUSION

For the reasons explained above, the Court grants the Defendants' motion for summary judgment (Dkt. 25) and denies Hernden's motion for summary judgment (Dkt. 24).